1  Christopher Hellmich (SBN 224169)
2  chellmich@hellmichlaw.com
   **HELLMICH LAW GROUP, PC**
3  5753-G E. Santa Ana Canyon Rd, #512
   Anaheim Hills, CA 92807
4  Tel: 949.287.5708
5  Fax: 714.974.7733

6  Talcott J. Franklin (appearing *pro hac vice*)
7  tal@talcottfranklin.com
   **TALCOTT FRANKLIN PC**
8  1521 North Cooper Street, Suite 340
9  Arlington, TX 76011
   Tel: 214.736.8730
10 Fax: 800.727.0659

11 *Attorneys for Relator*

12            UNITED STATES DISTRICT COURT

13           CENTRAL DISTRICT OF CALIFORNIA

14               SOUTHERN DIVISION

15
   UNITED STATES OF AMERICA, *ex*    Case No. SA 8:16-cv-01983 JVS (JCGx)
16 *rel.* JEREMY CALVA, *et al.*,

17                                   **RELATOR JEREMY CALVA'S**
                                     **RESPONSE TO DEFENDANTS'**
18         Plaintiff,               **MOTION TO DISMISS**

19      v.                          Hearing Date: June 11, 2018

20 IMPAC SECURED ASSETS CORP.,      Time: 1:30 p.m.
21 IMPAC FUNDING CORP., and IMPAC
   MORTGAGE HOLDINGS, INC.,         Judge: Hon. James V. Selna
22

23

24         Defendants.

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 1

I.      Relator's Complaint States a Claim and Should Not Be Dismissed. ....................... 1

      A.      Standard for Motion to Dismiss ..................................................... 1

      B.      Relator Has Identified a Claim Seeking Payment from the Federal Government ................................................................................. 2

      C.      Relator Has Alleged Materiality. ................................................... 5

      D.      Relator Has Alleged Scienter. ....................................................... 6

      E.      Relator Alleges a Conspiracy and Reverse False Claim. .................... 8

II.     Relator's Complaint Satisfies Rule 9(b) Pleading Standards. ..................... 9

III.    The Statute of Limitations Does Not Mandate Dismissal of Relator's Claims. ........................................................................................ 11

IV.     Relator's Claims Are Not Barred by the Public Disclosure Bar. ............ 12

      A.      Legal Standard for Public Disclosure Bar ..................................... 12

      B.      Substantially Similar Allegations and Transactions Were Not Publicly Disclosed. ................................................................. 14

      C.      The Complaint Is Not Explicitly Based Upon Public Sources. ........... 16

      D.      Relator Is an Original Source. ...................................................... 18

V.      The State Law Claims Must Not Be Dismissed. ......................................... 20

VI.     Leave to Amend ........................................................................... 21

CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**

*A-1 Ambulance Serv., Inc. v. California,* 202 F.3d 1238 (9th Cir. 2000) ................. 16, 17

*Baltazar v. Warden,* 635 F.3d 866 (7th Cir. 2011) ................................................. 18

*Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)* ................................................... 2

*Bloedow v. Planned Parenthood of the Great Northwest Inc.,* No. C11-1192
MJP, 2013 WL 6631771 (W.D. Wash. Dec. 16, 2013), *aff'd,* 654 F.
App'x 335 (9th Cir. 2016) ........................................................................ 12, 13, 19

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.,* 637 F.3d 1047 (9th Cir.
2011) ............................................................................................................. 3, 4, 5

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.,* 111 F.3d 1427 (9th
Cir. 1996), cert. denied, 523 U.S. 1112 (1998) ............................................ 12

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009), *cert. denied,* 561 U.S. 1024
(2010) ............................................................................................................... 2

*Dual Diagnosis Treatment Cty., Inc. v. Blue Cross of California*, No.
SACV-150736-DOC-DFMx, 2016 WL 6892140, at *3 (C.D. Cal. Nov.
22, 2016) .......................................................................................................... 21

*Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010)*, cert. denied*,
562 U.S. 1102 (2010) ..................................................................................... 10

*Hagood v. Sonoma Cnty. Water Agency,* 81 F.3d 1465, 1473 (9th Cir. 1996) ...... 17

*Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th Cir. 2014) ................................... 19

*Marks v. Global Mortgage Group, Inc.*, 218 F.R.D. 492, 495 (S.D.W.V.
2003) ............................................................................................................... 13

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (1031 (9th Cir.
2008) ............................................................................................................... 21

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008).......... 2

*Moore v. Kayport Package Express, Inc.*, 885 F.2d 531 (9th Cir. 1989)............ 9

*Oregon v. Legal Servs. Corp.,* 552 F.3d 965 (9th Cir. 2009) ............................ 1

*Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d. 73 (D.D.C. 2014) ..... 8

*Prather v. AT&T,* 847 F.3d 1097, 1103-04 (9th Cir. 2017) ................ 18, 19, 20

*Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014), *cert.
denied,* – U.S. –, 135 S. Ct. 1157 (2015) ...................................................... 12

*Seal 1 v. Seal A,* 255 F.3d 1154, 1158 (9th Cir. 2001) ..................................... 14

*St. Mary Med. Ctr. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. EDCV 10-035DOC (DTBx), 2010 WL 11457364 (C.D. Cal. July 16, 2010) ...................................................................................................... 2

*Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204 (9th Cir. 1995) ..................... 11

*United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525–26 (9th Cir. 1999) ........................................................................... 19

*United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1128 n.6 (9th Cir. 2015) ......................................................................... 19

*United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1202 (9th Cir. 2009) ........................................................................................ 19

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645 (D.C. Cir. 1994) ...................................................................................... 20

*United States ex rel. Zirzic v. Q2Administrators, LLC,* 728 F.3d 228, 242 (3d Cir. 2013) ................................................................................................ 20

*U.S. ex rel. Chin v. CVS Pharmacy, Inc.*, No. CV 09-1293 PSG PJWX, 2017 WL 4174416 (C.D. Cal. Aug. 15, 2017) ...................................................... 9

*U.S. ex rel. Devlin v. California,* 84 F.3d 358, 361 (9th Cir. 1996) ............... 19

*U.S. ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014 (9th Cir. 1999) ...................................................................................................... 13

*U.S. ex rel. JDJ & Assocs. LLP v. Natixis,* No. 15-cv-5427, 2017 WL 4357797 (S.D.N.Y. Sept. 29, 2017) ...................................................... 16

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242 (S.D.N.Y. 2014) ............................................................................................... 10, 11

*U.S. ex rel. Lee v. Corinthian Colleges,* 655 F.3d 984 (9th Cir. 2011) ......... 7, 9

*U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027 (9th Cir. 1998) ....... 13

*U.S. ex rel. Smith v. Yale Univ.,* 415 F. Supp. 2d 58, 72 (D. Conn. 2006) ...... 20

*U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313 (S.D.N.Y. 2004) ....... 8, 9, 11

*U.S. ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891 (N.D. Ill. 2009) ........................................................................................ 9

*U.S. v. Kiewit Pac. Co.,* 41 F. Supp. 3d 796 (N.D. Cal. 2014) ...................... 14

*U.S. v. Shane Browne, et al.,* No. 1: 11-cr-00449 (E.D.N.Y.). .................. 13, 19

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, -- U.S. --, 136 S. Ct. 1989 (2016) .............................................................................................. 3

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ...................... 9

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010), cert. denied, 564 U.S. 1037 (2011) ...................................................... 11

*Wang v. FMC Corp.,* 975 F.2d 1412 (9th Cir. 1992) .......................................... 17

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008) ...................... 2, 14

*Zucco Partners LLC v. Digimar Corp.*, 552 F.3d 981 (9th Cir. 1990) ................ 7

**STATUTES**

31 U.S.C. § 3730 ........................................................................... 13, 18, 19

31 U.S.C. § 3729 ......................................................................................... 7

**RULES**

Fed. R. Civ. P. 12 ................................................................................ 1, 2, 11

Fed. R. Civ. P. 9 .................................................................................... 1, 7, 9

Plaintiff-Relator Jeremy Calva ("Relator") respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) and Memorandum of Points and Authorities in Support of Motion to Dismiss ("Defs' Mem.").

## INTRODUCTION

Relator brought this False Claims Act ("FCA") case on behalf of the United States and state and local governments ("Government Plaintiffs") alleging that Defendants Impac Secured Assets Corp., Impac Funding Corp., and Impac Mortgage Holdings, Inc. ("Defendants") systematically and continually underreported loan delinquency rates and defaults in multiple residential mortgage-backed securities ("RMBS") trusts and falsely represented the health of the mortgage collateral that backed the investments made by the Government Plaintiffs. The United States and seven states declined to intervene in these proceedings. ECF Nos. 10, 15, 18, 19, 20, 21. On March 23, 2018, Defendants filed their Notice of Motion and Motion to Dismiss Pursuant to Rule 12(b)(6) and Memorandum in Support. ECF No. 38. Plaintiffs, for reasons set forth below, respectfully request that Defendants' motion to dismiss be denied.

## ARGUMENT

I.   **Relator's Complaint States a Claim and Should Not Be Dismissed.**

A.   **Standard for Motion to Dismiss**

Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 9(b). Under Fed. R. Civ. P. 12(b)(1), dismissal is proper if the district court lacks jurisdiction over the subject matter of the suit. If jurisdiction is challenged at the pleading stage, "general factual allegations of injury resulting from defendant's conduct may suffice[ ] because [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." *Oregon v. Legal Servs. Corp.,* 552 F.3d 965, 969 (9th Cir. 2009) (internal quotations and citations omitted)). When deciding a Rule 12(b)(1) motion, the district court will "assume plaintiff's factual allegations to be true and draw

all reasonable inferences in his favor." *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (alteration marks and citation omitted), *cert. denied*, 561 U.S. 1024 (2010).

A complaint may be dismissed under Fed. R. Civ. P. 12(b)(6) only if it does not contain enough factual allegations to state a claim for relief "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Plausibility only requires that the complaint have sufficient factual assertions "to raise a right to relief above the speculative level." *Id.* at 555. "A claim for relief is facially plausible when the plaintiff pleads enough facts, accepted as true, to allow a court to draw a reasonable inference that the defendant is liable for the alleged conduct." *St. Mary Med. Ctr. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. EDCV 10-035-DOCDTBx, 2010 WL 11457364, at *1 (C.D. Cal. July 16, 2010) (citation omitted). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). "All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 937 (9th Cir. 2008) (citation omitted).

### B. Relator Has Identified a Claim Seeking Payment from the Federal Government.

Defendants argue Impac did not sell any securities to the government, that underwriters were responsible for any sales of securities, and that not all breaches of contract or regulatory violations constitute a false claim. Defs' Mem. at 6-8. Furthermore, Defendants state that misrepresentations in SEC filings cannot be the basis for FCA liability. Defs' Mem. at 8.

Very simply, Relator asserts that neither the Government Plaintiffs nor their regulated financial institutions would have purchased the Impac securities if accurate delinquency and default information had been provided that actually disclosed the perilous state of much of the loan collateral. *See*, *e.g.*, Compl. ¶¶ 29, 119, 172. But because of Defendants' numerous false statements regarding the delinquency and default

- 2 -

characteristics of the loan payments that served as the *direct source of funds ultimately flowing to the Government Plaintiffs*, the Government Plaintiffs opted to purchase these securities. *See, e.g.*, *id*.

Relator's Complaint alleges an implied false certification theory of liability, whereby, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. The Supreme Court in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, -- U.S. --, 136 S. Ct. 1989 (2016), held liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's non-compliance with the statutory, regulatory, or contractual requirement. *Id.* at --, 136 S. Ct. at 1999-2001. If the non-compliance with regulations renders the representations misleading, liability attaches. *Id*.

Here Defendants made specific representations regarding the *sine qua non* of RMBS investment due diligence – defaults, repayment rates, and loan delinquencies – to the Government Plaintiffs. The failure to adequately describe the goods or services purchased by the Government gives rise to liability when the failure to disclose non-compliance with regulatory requirements is misleading. *Id*. Had Defendants disclosed the defaults and that the delinquency representations did not comply with the required reporting methodologies set forth in the SEC's Regulation AB, the Government Plaintiffs would have known that the delinquency and default information Defendants provided could not be relied upon and would not have incurred losses as a result of owning financial instruments backed by improperly described collateral.

Defendants cite *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011) for the proposition that non-compliance with regulations cannot constitute a "claim." Defs' Mem. at 7. There, the alleged violation concerned the failure to disclose the existence of valuable intellectual property rights that were to be assigned to the government under the terms of a *pre-existing* contract. *Id.* at 1054. Here, by contrast, the false statements were knowingly made in connection with and at the time of

offering the certificates to the Government Plaintiffs, which false statements continue to this day. The court in *Cafasso* noted "[w]hile her pleading alleges that [defendant's] non-disclosure of new inventions deprived the United States of lower-cost services by third-party entities, it does not allege that [defendant] falsely asserted an entitlement to obtain or retain government money" pursuant to the pre-existing contract. *Id*. at 1056.

Relator does not argue that Defendants deprived the government of cheaper alternatives as the basis for FCA liability. Relator argues that the false statements regarding the presence of loans in monetary default as of the Closing Date for the trusts, as well as the falsely disclosed methodologies for calculating loan delinquency rates as of the Cut Off Date, hid losses inherent in certificates at the time the Government Plaintiffs decided to purchase them. Because the delinquency and default profile of the loan collateral was misrepresented, the value of the certificates purchased by Government Plaintiffs was worth significantly less that what the Government Plaintiffs were led to believe.   Compl. ¶¶ 119. Absent Defendants' misrepresentations the Government Plaintiffs and their regulated financial institutions either would not have purchased the certificates or would have paid substantially less for them.

Moreover, Defendants set up a system that resulted in repeated delinquency misrepresentations to investors throughout the life of the Trusts via remittance reports shared with each Trust's beneficiaries, including the Government Plaintiffs. Compl. ¶¶ 11, 33, 108. These misrepresentations were repeated each and every month to the detriment of the Government Plaintiffs, who could have requested that the non-conforming loans be repurchased thereby minimizing their losses. *Id*. In other words, Defendants created a system whereby false statements made in the offering documents would be repeated in monthly trust reporting, which directly impacts *the payment obligations to the government*. This is, therefore, a very different scenario than the situations where SEC filings have no association with a financial claim on or obligation to the government.

**C.    Relator Has Alleged Materiality.**

Relying on the United States Supreme Court's recent *Escobar* decision, Defendants argue that Relator fails "to identify a government statement establishing that payment for RMBS is conditioned on use of a particular methodology for calculating delinquencies" or prior instances in which the government declined to make payments when similar delinquency reporting misrepresentations were made in the past. Defs' Mem. at 9.

*Escobar* makes clear, however, that the relevant analysis is the *Defendants'* state of mind regarding the alleged behavior. Whether the Defendants felt the delinquency and default misrepresentations were relevant to the Government Plaintiffs' purchasing decisions is the relevant inquiry. Materiality is shown where Defendants "knew or had reason to know that the recipient of the representations attached importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Escobar*, __ U.S. at __, 136 S. Ct. at 2002-03 (internal quotations and citation omitted); Doc. 42 (United States' Statement of Interest) at 5-6.

Defendants were fully aware of the significance of their actions. First, the offering documents make clear that Defendants knew the significance attached to their delinquency and default representations. Indeed, Defendants were aware that the misrepresentations were material to the Government Plaintiffs' purchase because the remedy for such a misrepresentation was to replace or repurchase loans subject to Defendants' misrepresentations. Compl. ¶¶ 4.b, 10.a, 28, 44, 120, 134-35.

Delinquency and default reporting is the very essence *sine qua non* of RMBS due diligence and securities analysis. Fundamentally, the securities are promises to pay back money, and the delinquency and default reporting characteristics state whether these promises are being kept. *See* Compl. ¶ 78 ("red flag for investors"). Defendants' misrepresentations *in every instance* had the effect of making the loan collateral more attractive, not less. Typical issuers of subprime mortgage-backed securities employ the most lenient standard for delinquency reporting available. *See* Compl. ¶¶ 95-97

(describing primary delinquency reporting methods). But Defendant went beyond even that and put in place a system where loan delinquencies would *always* be counted in an even more favorable way. Compl. ¶ 162.

Defendants argue that mere regulatory non-compliance is no basis for FCA liability. Defs' Mem. at 10. Irrespective of whether a showing of "mere non-compliance" is sufficient for purposes of stating an FCA claim, the Complaint does not allege "mere non-compliance" with a regulation. Defendants were in the business of originating and selling residential mortgages. Delinquency and default status is the most fundamentally relevant characteristic of that product, and it was systematically misrepresented to the Government purchasers. Compl. ¶¶ 4, 162. Not only did every instance of misreporting result in figures more favorable to Defendants, the Complaint also alleges that Defendants were proactively hiding the problems regarding the securities it issued, including failing to release timely monthly remittance reporting for the trusts. Compl. ¶¶ 4, 13, 122, 148-49. In summary, this is not an instance where technical non-compliance with an arcane government regulation serves as the basis for FCA liability. Defendants affirmatively and intentionally hid the reality from the Government Plaintiffs.

**D.    Relator Has Alleged Scienter.**

Defendants argue that their "objectively reasonable" interpretation of Regulation AB reporting requirements defeats the FCA's scienter requirements because the reporting standards that Defendants failed to adhere to are merely customary, and "failure to comply with a methodology that is merely *customary* cannot give rise to a knowing violation." Defs' Mem. at 10-11 (emphasis in original). This misunderstands both Regulation AB requirements and the nature of Defendants' behavior as alleged in the Complaint.

Under the FCA, the terms "knowing" and "knowingly" are defined to mean that a person "has actual knowledge of the information; acts in deliberate ignorance of the trust or falsity of the information; or acts in reckless disregard of the trust or falsity of the

information," while at the same time requiring "no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1). These allegations of scienter may be alleged generally despite Fed. R. Civ. P. 9(b)'s requirement that circumstances constituting fraud or mistake be stated with particularity. *U.S. ex rel. v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011) (citing *Zucco Partners LLC v. Digimar Corp.,* 552 F.3d 981, 990 (9th Cir. 1990)). There the Court stated that allegations of knowing conduct in the complaint were sufficient to allege scienter, but allowed the relator to amend the complaint to add allegations of knowing conduct concerning defendant's state of mind regarding reliance on a safe harbor provision. *Id.* at 997; Doc. 42 (United States' Statement of Interest) at 4-5.

Defendants here rely on one explanatory paragraph of Relator's Complaint that states in part: "The Determination Date is customarily the 15th of the month in which distribution is paid to certificate holders." Compl. ¶ 151. While that statement is accurate insofar as it describes typical market conditions and the custom and practice in the RMBS industry of using a mid-month Determination Date, the actual date of the month (the 15th, in this instance) is not the relevant portion of Relator's allegations. Rather, it is that, *regardless* of *which date* was chosen as the Determination Date, Defendants manipulated the delinquency reporting system to assure an additional, undisclosed period of up to fourteen days when delinquent payments would simply not register as delinquent, thereby intentionally skewing the characteristics of the loan collateral to report a more favorable delinquency number than reality dictated. Compl. ¶¶ 126-27, 152-154.

Relator does not allege that Defendants made a false statement by disclosing a Determination Date other than the customary 15th day of a month. Rather, Relator alleges that, regardless of which Determination Date was chosen, Impac manipulated delinquency reporting methods to build in a "float" period that could *only* have the effect of improving the characteristics of the loan pool. It is this undisclosed float period that is the basis for the inaccurate and misleading loan delinquency figures.

**E.     Relator Alleges a Conspiracy and Reverse False Claim.**

Defendants rely on *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d. 73 (D.D.C. 2014), for the proposition that the Complaint fails to allege a reverse false claim. Defs' Mem. at 11. The claims in that case were rejected because the false claims – exaggerating aspects of an individual's background in "publications, brochures, and other media" – could not be connected to any claims for payment. *Pencheng*, 71 F. Supp. 3d at 92-93. Relator's Complaint, by contrast, sets forth the implied certification of compliance with both Regulation AB and contractual requirements in the transaction documents for the trusts at issue. The connection to a government payment is clear: The government invested because the loan collateral was misrepresented. Compl. ¶ 29, 59, 62, 63.

Defendants next argue "Relator has not alleged a claim of any sort," including "a claim setting forth a lack of an obligation to make a payment to the government." Defs' Mem. at 11. But this is precisely the allegation set forth in the Complaint. Specifically, the false delinquency and default calculations deliberately obfuscated loans that were likely subject to repurchase and would have been subject to the notice process by investors, including the Government Plaintiffs, had Impac not shielded the reality regarding the diminishing value of the loan collateral from investors' eyes. *See* Compl. ¶¶ 4.b, 10, 30, 44, 132, 134-35.

Furthermore, Defendants' effort to equate mortgage loan repurchase obligations to a "refund," *see* Defs' Mem. at 12, misapprehends the nature of the loan repurchase obligation. In a mortgage loan repurchase, the mortgage loan seller buys the loan back from the trust, and the funds from that repurchase are distributed to investors through the trust waterfall. That is not the same transaction as the Government Plaintiffs' purchase of the RMBS. *Cf. U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 339 (S.D.N.Y. 2004) ("Close examination of these claims leads to the inescapable conclusion that they are redundant—two ways of describing the same transaction."). Finally, while Relator agrees with the United States that FCA complaints may allege both affirmative and reverse false claims, United States' Statement of Interest [Doc #42], at 7, Defendants' argument only

results in dismissal if a plaintiff successfully pleads redundant claims. *Gabelli*, 345 F. Supp. 2d at 339.

## II. Relator's Complaint Satisfies Rule 9(b) Pleading Standards.

The Complaint satisfies Fed. R. Civ. P. 9(b) because it is "specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge and not just deny that they have done anything wrong." *U.S. ex rel. Chin v. CVS Pharmacy, Inc.*, No. CV 09-1293 PSG PJW, 2017 WL 4174416, at *3 (C.D. Cal. Aug. 15, 2017) (J. Gutierrez) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)); *see also Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendants can prepare an adequate answer from the allegations.").

Relator's Complaint describes each of the Defendants' roles in the Trusts at issue (Compl. ¶¶ 46-49) – allegations that distinguish Relator's Complaint from that at issue in each of *U.S. ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984, 997 (9th Cir. 2011) (complaint failed to describe the nature of the individual defendants' involvement) and *U.S. ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891 (N.D. Ill. 2009) (complaint failed to describe John Doe defendants' involvement). Impac Secured Assets Corp. was the depositor and issuer for all of the trusts at issue in Relator's Complaint. Compl. ¶ 46. The roles of depositor and issuer in a securitization transaction are set forth in detail in the Complaint. Compl. ¶ 68. Impac Funding Corp. was the primary originator, sponsor, and master servicer for the trusts. Compl. ¶ 47. The Complaint subsequently defines those roles as performed in the securitization transactions. Compl. ¶ 69. Impac Mortgage Holdings, Inc. was the parent company who oversaw and coordinated the efforts of the other Defendants in carrying out the allegations set forth in the Complaint. Compl. ¶ 48.

The Complaint also sets forth in great detail the two primary schemes by which Defendants misrepresented the quality of the securities. The Complaint, for example,

describes Defendants' "drift" and "float" tactics whereby they purposefully hid from investors, including the Government Plaintiffs, that many loans had significant repayment risk and instead "disclosed" that none of the loans were delinquent. Compl. ¶¶ 124-28. These misrepresentations and non-disclosures, as alleged in the Complaint, appear repeatedly in each remittance report published by Defendants. Compl. ¶¶ 130-31, 150-57. The Complaint describes this scheme in detail and provides numerous examples. The Complaint also describes each of the Defendants' roles in the Trusts at issue (Compl. ¶¶ 46-49), facts that distinguish Relator's Complaint from that at issue in *Corinthian College* and *Northshore Univ. Healthsystem*. Contrary to Defendants' argument these allegations are ample support for Relator's claim that this fraudulent scheme has been occurring since the 2005-2007 time period. *See* Defs' Mem. at 16. As this Court recently noted – and as the cases relied on by Defendants also note – "an FCA complaint need not 'identify representative examples of false claims to support every allegation.'" *Chin*, 2017 WL 4174416, at *6 (citing *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (cited by Defendants*), cert. denied*, 562 U.S. 1102 (2010)). Rather, "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 999 (internal quotations and citation omitted).

In *Chin*, this Court relied on *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 255 (S.D.N.Y. 2014), to explain the unwillingness of courts to require qui tam plaintiffs to plead each and every instance of fraudulent conduct:

> In cases where the alleged fraudulent scheme is extensive and involves 'numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct.' Pleading the specifics of thousands of claims would be 'cumbersome, unwieldy, and would accomplish no purpose.' Instead, the complaint must provide the defendant with enough details to be able to reasonably discern which of the claims it submitted are at issue. In cases with extensive schemes, plaintiffs can satisfy this requirement in two ways: (1) providing sufficient identifying information about all the false claims, or (2) providing example false claims.

*Chin*, 2017 WL 4174416, at *7 (quoting *Kester*, 23 F. Supp. 3d at 255). Relator's Complaint both provides sufficient identifying information about all the false claims *and* provides example false claims, and thus easily meets the Rule 9(b) pleading standard for *qui tam* complaints. Indeed, even authority that Defendants cite suggests that Defendants' Rule 9(b) arguments lack merit. *See Gabelli*, 345 F. Supp. 2d at 339.

## III.   The Statute of Limitations Does Not Mandate Dismissal of Relator's Claims.

Relator's claims are not barred by the FCA's statute of limitations. A claim may be dismissed under Fed. R. Civ. P. 12(b)(6) on the ground that it is barred by an application statute of limitations "only when the running of the statute is apparent on the face of the Complaint." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (internal quotations and citation omitted), *cert. denied*, 564 U.S. 1037 (2011). "[A] complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1207 (9th Cir. 1995) (citation omitted).

Defendants' entire argument on this point is based on their incorrect attempt to limit Relator's claims to those "based upon alleged sales of securities during 2005-2007" (Defs' Mem. at 15-16), but the Complaint is replete with allegations that Defendants' frauds and misrepresentations (resulting in false claims) remain ongoing even to the present day, both related to defaults and delinquencies.[1] Because the preparation and

---

[1] Compl. ¶ 4(d); *id.* ¶ 11 ("Impac continues to make misrepresentations of loan delinquency rates in monthly distribution remittance reports that are still being issued to the present day."); *id.* ¶ 33 ("The Impac Defendants continue to be liable for the misstatements and omissions of material fact contained in the monthly remittance reports up to and including the current period ...."); *id.* ¶ 108 ("From the outset of these transactions until the present time, the Impac Defendants (both falsely and deceptively) misrepresented that they have made 'no untrue statements....'"); *id.* ¶ 120 ("In each of the foregoing instances, by falsely certifying and/or causing others to falsely certify that there were no untrue statements relevant to the Trusts, the Impac Defendants facilitated their *initial and ongoing, to the present, avoidance of their obligations to replace or repurchase loans that were in default*, which obligation was required to be fulfilled in

publication of each monthly distribution remittance report constitutes a new and independent overt act by Defendants that inflicts new and accumulating injury on Government Plaintiffs, the statute of limitations restarts with each such publication and dissemination. *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014), *cert. denied*, – U.S. –, 135 S. Ct. 1157 (2015) (overt act existed where new license agreement included products not covered by the previous license agreement); *see also Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1444-45 (9th Cir. 1996), *cert. denied*, 523 U.S. 1112 (1998). Each such remittance report is not merely a "recasting" of a prior report, *see* Defs' Mem. at 16, but contains new and independently harmful misrepresentations.

## IV.   Relator's Claims Are Not Barred by the Public Disclosure Bar.

### A.   Legal Standard for Public Disclosure Bar

Contrary to Defendants' arguments, Relator's claims are not barred by the public disclosure bar as: (1) the allegations set forth in the Complaint are not "substantially similar" to prior disclosures; (2) the allegations are not based upon information contained in public sources; and (3) Relator is, in any event, the "original source" of his allegations. Defs. Mem. at 16-18.

As stated in *Bloedow v. Planned Parenthood of the Great Northwest Inc.,* No. C11-1192 MJP, 2013 WL 6631771 (W.D. Wash. Dec. 16, 2013), *aff'd*, 654 F. App'x 335 (9th Cir. 2016):[2]

---

order to create and maintain Trusts supported by pools of assets that would provide the represented stream of income supporting the purchase price and ongoing market value of the Trust Certificates.") (emphasis added); *see, e.g., id.* ¶¶ 182-83, 185-86 (alleging that Impac "may still be" making false claims and the various governments "may continue to pay" those claims).

[2] Defendants claim that although Congress amended the "public disclosure bar" effective March 22, 2010, the pre-amendment bar applies to Relator's claims because "the complaint alleges that the RMBS Trusts were issued between 2005 and 2007." Defs' Mem. at 17. In fact, as the cases cited by Defendants make clear, the statute in effect when "the conduct at issue" took place controls. *Bloedow,* 2013 WL 6631771, at *2; *U.S.*

The 9th Circuit has summarized the requirements of the public disclosure bar as a two-part test. First, the Court must determine whether there was a prior 'public disclosure' of the 'allegations or transactions' upon which Plaintiff–Relator's complaint is based. *See United States ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.,* 197 F.3d 1014, 1018 (9th Cir. 1999). If the answer to the first question is in the affirmative, the Court moves on to the second step: whether Plaintiff is an 'original source.' *See id.*

*Bloedow,* 2013 WL 6631771, at *2. The public disclosure bar requires prior "public disclosure" of the "allegations or transactions" underlying the *qui tam* suit and that the prior disclosure occurred through sources enumerated in the statute. *See Alcan,* 197 F.3d at 1018; 31 U.S.C. § 3730(e)(4)(A).

The allegations in the Complaint, which must be taken as true, were derived from the Relator's work as an expert witness in *U.S. v. Browne, et al.,* No. 1: 11-cr-00449 (E.D.N.Y.). Compl. at ¶ 136-141. In the course of his work as an expert in *Browne,* the Relator obtained a mortgage note, never publicly disclosed, which defined when a loan was in default. *Id.* at ¶ 142. Indeed, mortgage notes are well-protected private documents. *See Marks v. Global Mortgage Group, Inc.,* 218 F.R.D. 492, 495 (S.D.W.V. 2003) (considering whether to require defendants to produce, *inter alia*, mortgage notes, which is nonpublic personal financial information protected from disclosure under the Gramm-Leach-Bliley Act).

Through review of the terms set forth in this private document, the Relator discovered that Defendants were knowingly placing loans in the trust that were in default, in breach of representations and warranties. *Id.* at ¶¶ 4.b, 142, 145. Through his own rigorous analysis, the Relator ultimately uncovered Defendants' complex fraudulent scheme that included misrepresenting the number and percentage of delinquent loans by

_____

*ex rel. Lujan v. Hughes Aircraft Co.,* 162 F.3d 1027, 1031 (9th Cir. 1998). Because the Relator's Complaint is based upon conduct occurring up to and including the date of the filing of the Complaint, *see* Compl. ¶ 11, the amended version of the public disclosure bar is arguably applicable. However, as set forth herein, Relator prevails under either version of the statute.

claiming they were using the permitted OTS Method when, in fact, they were using their own unapproved methodology that shifted loans to the next most favorable delinquency bar. The Defendants' wrongdoing relating to default and delinquency rate reporting is based upon documents and facts discovered by Relator that have never been publicly disclosed—whether in case law, government reports or other sources.

As Defendants argue, the "purpose of the public disclosure bar ... is to discourage 'parasitic lawsuits in which those with no independent knowledge of fraud use information already available to the government to reap rewards for themselves without exposing any previously unknown fraud.'" Defs' Mem. at 17-18 (quoting *U.S. v. Kiewit Pac. Co.,* 41 F. Supp. 3d 796, 804 (N.D. Cal. 2014) (quoting *Seal 1 v. Seal A,* 255 F.3d 1154, 1158 (9th Cir. 2001)). In this case, Relator used his own independent knowledge of fraud, gained through his work as an expert witness, to expose *previously unknown fraud*. Compl. ¶¶ 40-41, 51; *Williams*, 552 F.3d at 937 (all material allegations in the complaint must be taken as being true).

### B.   Substantially Similar Allegations and Transactions Were Not Publicly Disclosed.

In arguing that allegations substantially similar to Relator's claims have been publicly disclosed, Defendants point to a complaint filed by the Federal Home Loan Bank of Boston ("FHLBB") pertaining to the quality of loans in pools underlying RMBS sold by Impac and others. As Defendants' Memorandum makes clear, the prior FHLBB complaint, involving different trusts, made *general allegations* of misstatements and omissions in the offering materials that are in no way similar to the detailed allegations of fraud, exposing a pattern of misrepresentation of delinquencies and defaults, discovered by Relator at issue in this case. In the chart on page 19 of their Memorandum, Defendants cherry pick allegations in the Relator's complaint in an attempt to show similarity to the FHLBB complaint, while ignoring specific allegations in Relator's Complaint unique to his work and based upon a document never previously disclosed. Significantly, Defendants ignore paragraphs 98-120 of the Complaint detailing their motive and

opportunity to engage in the fraudulent scheme, as well as the specifics of their "systematic fraud" set forth in paragraphs 121-131 of the Complaint. While Defendants claim that Relator's Complaint does nothing more than announce that the RMBS trusts issued by Defendants between 2005 and 2007 contained "poorer quality" loans than described in the offering documents, allegations previously asserted by FHLBB, *see* Defs' Mem. at 20, Relator's Complaint, in fact, goes far beyond that, detailing the specific delinquency and default scheme employed by Defendants to misrepresent the defaults and delinquency rates in the loans underlying the RMBS trusts.

Furthermore, Defendants or their affiliates are the originator, servicer, master servicer, sponsor and depositor of the trusts. They had obligations to demand repurchase of loans that violated the representations and warranties. Such repurchase demands required disclosure through remittance reports, special notices to investors, and in the ABS15G reporting. Compl. ¶ 143. Even if someone were to divine that the general problems alleged by FHLBB indicated a larger scheme to cover up defaults and delinquencies, the absence of Defendants' repurchase demands related to delinquency or default, in addition to the monthly remittance reporting misrepresenting delinquencies and the lack of loans tendered for repurchase, indicated that no delinquency or default problem existed.

Defendants' description of Relator's role as an expert witness strengthens Relator's arguments regarding public disclosure. As Defendants describe it, the Government viewed Defendants as the victims of mortgage fraud. Defs' Mem. at 23-25. What Relator discovered – contrary to the Government's belief in *Browne* – is that even if Defendants are victims of the type of fraud alleged by FHLBB and for which Relator's clients were convicted (poor quality loans), Defendants are perpetrators of another type of fraud involving misrepresenting delinquencies and defaults. These were facts unknown to the Government. Indeed, had the government been aware of Defendants' scheme, the SEC would have issued a cease and desist order. *See, e.g., In the Matter of Morgan Stanley and Co. LLC, Morgan Stanley ABS Capital I Inc., and Morgan Stanley Mortgage Capital*

*Holdings LLC*, File No. 3-15982, Order Instituting Cease-And- Desist Proceedings Pursuant to Section 8A of The Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order (SEC Release No. 9617 / July 24, 2014) ("although Morgan Stanley represented that the number and percentage of currently delinquent loans included in the HE7 offering materials was as of the transaction's September 1, 2007 cut-off date, Morgan Stanley actually used payment data as of mid-September to determine the disclosed delinquencies. By using the later payment data, Morgan Stanley misreported the number of current delinquencies by 46 loans.").

While the court in *U.S. ex rel. JDJ & Assocs. LLP v. Natixis,* No. 15-cv-5427, 2017 WL 4357797 (S.D.N.Y. Sept. 29, 2017), viewed a similar argument as slicing "the onion way too thin," the *Natixis* complaint did not give rise to an inference that the Government viewed the *Natixis* defendants as victims or that Relator served as an expert witness in a criminal case involving the *Natixis* defendants in which he obtained private, nonpublic information (specifically, the Note) critical to determining Defendants were placing loans then *in monetary default* into the trusts. The Natixis complaint, in fact, had no allegation concerning defaults and was based entirely on delinquencies. However, this juxtaposition demonstrates, respectfully, why the *Natixis* court got it wrong: The general allegations of bad loans are obviously not indicative of the fraud involving delinquencies.

## C.   The Complaint Is Not Explicitly Based Upon Public Sources.

In further arguing that Relator's Complaint is based upon public sources, Defendants point to various SEC filings. Defs' Mem. at 22. These public filings, however, constitute the means by which Defendants carried out and attempted to conceal their fraudulent scheme—a scheme Relator discovered through his own rigorous analysis. Rather than Defendants' wrongdoing being based upon any public filings, the fraudulent methodology discovered by the Relator is set forth in and evidenced by those filings.

In arguing that a relator must do more than apply expertise to publicly disclosed data, Defendants rely upon the holding in *A-1 Ambulance Serv., Inc. v. California,* 202 F.3d 1238 (9th Cir. 2000). In that case, the relator claimed that ambulance contracts,

awarded following public bidding, conferences, and board meetings, that denied subsidies to cover the cost of ambulance service to indigent persons, forced the ambulance providers to artificially inflate their rates to Medicare patients in order to offset the losses. Because the relator in *A-1 Ambulance* did not claim to be an "original source," the court stated that it must first determine whether the disclosure originated in one of the sources enumerated in the statute and "whether the content of the disclosure consisted of the 'allegations or transactions' giving rise to the relator's claim, as opposed to "mere information.'" *Id.* at 1243 (quoting *Hagood v. Sonoma Cnty. Water Agency,* 81 F.3d 1465, 1473 (9th Cir. 1996)). In rejecting the relator's claim, the *A-1 Ambulance* court pointed to the "deliberate and intentional" public disclosure of the contents of the contracts through extensive administrative proceedings preceding the awarding of the contracts. 202 F.3d at 1244. The court found that in numerous public proceedings, the essential "transactions" underlying the fraud claim had been disclosed, including the amount of county subsidies, the fact that the county would not bill for indigent patients, the maximum rates ambulance drivers could charge Medicare, and whether Medicare reimbursements would be sufficient. The court then concluded that A-1 "merely 'repeats what the public already knows.'" *Id.* at 1245 (quoting *Wang v. FMC Corp.,* 975 F.2d 1412, 1417 (9th Cir. 1992)).

The allegations upon which Relator's claims in this *qui tam* action are based are, on the other hand, the result of Relator's own discovery that Defendants *inter alia*: "falsified the Cut-Off Date mortgage loan schedules and designed a non-Reg AB and non-OTS method to mask its manipulation of the underlying data so as to improperly shift the loans to the next most favorable delinquency tier for all monthly remittance reporting. Impac's alteration of paid-to dates in the Cut-Off Data mortgage loan schedule and home-cooked method for monthly reporting were impermissibly more lenient than the OTS method and therefore violated Regulation AB." Compl. ¶ 94. Far from repeating what the public already knows, the information used by Relator to uncover the fraudulent

scheme was virtually inaccessible to the public and, once accessed, was in a format indecipherable to the general public. *Id.* ¶ 50.

Further, Defendants' delinquency reporting schemes regarding the RMBS trusts at issue in these transactions has never been part of the public record. Unlike the allegations of RMBS wrongdoing affecting the value of trusts, cited by Defendants, having nothing to do with delinquency reporting or the inclusion of loans in monetary default as of the Cut-Off Date, the specific facts regarding these particular trusts are not in the public domain and came solely from the Relator. Compl. ¶ 124-127; 144-146. As noted above, in his work as an expert witness, the Relator was provided a mortgage note, never publicly disclosed, that set forth the definition of default through which the Relator was able to begin to untangle the Defendants' fraudulent scheme. *See Baltazar v. Warden,* 635 F.3d 866, 869 (7th Cir. 2011) (government reports of industry-wide practices are insufficient to invoke the FCA's public disclosure bar where the relator adds "vital" facts not in the public domain).

### D. Relator Is an Original Source.

Contrary to Defendants' arguments, the 2010 Amendments did substantively change the public disclosure bar by changing the definition of "original source." Defs Mem. at 17; *see also Prather v. AT&T,* 847 F.3d 1097, 1103-04 (9th Cir. 2017). Prior to the 2010 Amendments, the statute defined an "original source" as "an individual who [1] has direct and independent knowledge of the information on which the allegations are based and [2] has voluntarily provided the information to the Government before filing an action ... based on the information." *Id.* at 1104 (quoting version of 31 U.S.C. § 3730(e)(4)(B) in effect prior to 2010). Since the 2010 Amendments, "original source" is defined as: "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an

action under this section." 31 U.S.C. § 3730(3)(4)(B). Under either the pre- or post-2010 Amendments' requirements, Relator is an "original source" of the subject information.

As stated in *Bloedow,* "[t]o claim the mantle of original source, relators must 'see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else.'" 2013 WL 6631771, at *6 (quoting *U.S. ex rel. Devlin v. California,* 84 F.3d 358, 361 (9th Cir. 1996)). *Accord Prather,* 847 F.3d at 1104 ("To have direct knowledge under the statute, a person's knowledge must be firsthand, obtained through his own labor, and unmediated by anything else.") (citing *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1202 (9th Cir. 2009), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1128 n.6 (9th Cir. 2015)). In *Prather,* the Ninth Circuit rejected a *qui tam* action reasoning that the relator "filed suit on the basis of speculation, and not—as required by the applicable law—true knowledge of fraudulent misconduct." *Prather,* 847 F.3d at 1105. As stated in *Prather*:

> The person must also have "true knowledge," as opposed to guesswork or suspicion, since "the purposes of the Act would not be served by allowing a relator to maintain a qui tam suit based on pure speculation or conjecture." *United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 525–26 (9th Cir. 1999); *Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th Cir. 2014) (concluding that "generalized suspicion" did not constitute "knowledge" of a kickback scheme).

847 F.3d at 1104.

As Defendants acknowledge (Defs' Mem. at 23), Relator gained the information upon which this *qui tam* Complaint is based while serving as an expert witness for the defendant in *U.S. v. Shane Browne, et al.,* No. 1: 11-cr-00449 (E.D.N.Y.). Like the "whistleblowers" in classic *qui tam* cases, the Relator's review of documents in connection with his work as an expert, including the nonpublic mortgage note, led to his discovery of Impac's fraudulent scheme. Contrary to Defendants' argument, the Relator did not base his claims on "information that he was 'provided by the government during discovery.'" Defs' Mem., at 24. Rather, such information evidenced the ongoing scheme

- 19 -

the Relator discovered through his own efforts and through previously undisclosed information. The Relator obtained his knowledge "through his own labor unmediated by anything else." *Prather,* 847 F.3d at 1104. *See U.S. ex rel. Smith v. Yale Univ.,* 415 F. Supp. 2d 58, 72 (D. Conn. 2006) ("It is not therefore necessary for a relator to have all the relevant information in order to qualify as independent so long as the relator possesses substantive information, or core information, about a particular fraud.").

In *United States ex rel. Zirzic v. Q2Administrators, LLC,* 728 F.3d 228, 242 (3d Cir. 2013), cited by Defendants, the court affirmed the dismissal of a *qui tam* action alleging Medicare fraud, reasoning that the relator "has not explained how his expertise aided his analysis" and finding that "[s]urely a member of the public could conclude, with minimal labor" the nature of the alleged fraud. *See* Defs' Mem. at 23.  The court in *Zirzic* contrasted the relator in the case before it with the one in *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645 (D.C. Cir. 1994), where, the *Zirzic* court noted, "civil discovery publicly disclosed information that did not constitute allegations or transactions of fraud, but that did pique the relator's curiosity." *Zirzic,* 728 F.3d at 239.

> The relator then "conduct[ed] its own investigation" of that information, 14 F.3d at 656, by "interview[ing] with individuals and businesses identified" in the discovery, *id.* at 657. Because the relator "bridged the gap" between the innocuous publicly disclosed information and the allegation of fraud through "its own efforts and experience," the court held that it was an original source. *Id.*

*Id.*

Like the relator at issue in *Springfield Terminal,* the Relator in this case, through his own efforts and expense, conducted an investigation of information he encountered working as an expert witness and thereby "bridged the gap" between the innocuous publicly disclosed information and the Defendants' fraudulent scheme.

## V.    The State Law Claims Must Not Be Dismissed.

Defendants argue that the state law claims must be dismissed because the federal claims must be dismissed; or, the state law claims "must be dismissed for the same

reasons as the federal FCA claims." Defs' Mem. at 25. Those arguments have been addressed *in toto, supra*. The Complaint alleges state and municipal entities, individually identified in the Complaint, incurred damages by purchasing certificates in the same trusts as did the federal Government Programs. *See e.g.* Compl.  ¶¶ 196, 201, 205, 210, 214, 219.

## VI.    Leave to Amend

Relator contends he has properly pleaded facts sufficient to allege plausible claims such that Defendants' Motion should be denied in its entirety. However, if the Court determines that any of Relator's claims failed to meet the pleading standard, Relator respectfully requests the Court dismiss the claim without prejudice and grant Relator leave to amend it to address any perceived deficiencies. *Dual Diagnosis Treatment Cty., Inc. v. Blue Cross of California*, No. SACV-150736-DOC-DFMx, 2016 WL 6892140, at *3 (C.D. Cal. Nov. 22, 2016) (citing *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (1031 (9th Cir. 2008) ("A district court should provide leave to amend upon granting a motion to dismiss, unless it is clear that the complaint could not be saved by any amendment.").

## CONCLUSION

For the foregoing reasons, Relator respectfully requests that the Court deny Defendants' motion to dismiss.

Dated: April 30, 2018                              Respectfully submitted,


                                        By: /s/ Christopher Hellmich
                                           Christopher Hellmich
                                           HELLMICH LAW GROUP, P.C.
                                           5753-G E. Santa Ana Canyon Rd, #512
                                           Anaheim Hills, CA 92807
                                           Tel.: 949.287.5708
                                           Email: chellmich@hellmichlaw.com

                                        Attorney for Relator

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018, a true and correct copy of the foregoing was filed via the CM/ECF System and was served upon all attorneys of record who have entered an appearance in this case. Copies will be separately sent to interested parties who are not receiving copies through the CM/ECF System.

/s/ Christopher Hellmich
Christopher W. Hellmich